IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

ELEODORO GARCIA and
JONATHAN X. ABELL,

      Plaintiffs,

and

EVEREST NATIONAL INSURANCE
CO. a/s/o NUGATE GROUP, LLC

      Plaintiff-Intervenor,

    vs.

UNITED STATES OF AMERICA,

      Defendant.

CIVIL NO. 19-00658 KJM

**ORDER DENYING DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT [ECF NO. 247]**

**ORDER DENYING DEFENDANT UNITED STATES OF AMERICA'S
MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT [ECF NO. 247]**

The instant motion requires this Court to dive into the trenches of the

Discretionary Function Exception ("DFE") of the Federal Tort Claims Act

("FTCA") and determine whether the Defendant United States of America's

decisions with respect to Plaintiffs Eleodoro Garcia and Jonathan Abell

(collectively, "Plaintiffs") in this action are shielded from tort liability.

Plaintiffs initially filed their action against the United States of America for

its failure to clear the area of Makua Military Reservation where Plaintiffs were

injured.  Plaintiffs return with an amended complaint that alleges that Plaintiffs were injured because the United States of America failed to provide Plaintiffs with the support required under its own regulations and policies.  The United States of America seeks dismissal of Plaintiffs' complaint.

For the reasons discussed in this Order, the Court DENIES the United States of America's Motion to Dismiss.

## I.  BACKGROUND

A.    Facts

The Makua Military Reservation ("MMR") was a live ordnance target practice facility on Oʻahu, Hawaiʻi, used by the United States Department of the Army ("Army") for live-fire exercises dating back to the 1920s.  ECF No. 252-1 at 10; ECF No. 261 at 7.  According to Defendant United States of America ("the Government" or "Defendant"), "[f]ollowing the attack on Pearl Harbor during World War II, the military increased training on MMR."  ECF No. 252-1 at 10.

Defendant asserts that "[a]ircraft practiced aerial bombing missions on the range, while Navy warships shelled the valley from the oceans."  *Id*.  Defendant contends that the Army more recently "used live mortar rounds, anti-tank artillery, and machine gun fire in the valley for pre-deployment training exercises."  *Id*.  Consequently, unexploded ordnances ("UXO") "remain randomly scattered and

2

undetected throughout MMR[,] and "[t]here is no record of the total amount of munitions used at MMR and no count as to the current amount of UXO." *Id*.

UXOs are military munitions that "(A) have been primed, fuzed, armed, or otherwise prepared for action; (B) have been fired, dropped, launched, projected, or placed in such a manner as to constitute a hazard to operations, installations, personnel, or material; and (C) remain unexploded whether by malfunction, design, or any other cause[.]" Exhibit 2 to Government's Motion to Dismiss (Army Regulation 350-19 (August 30, 2005), hereinafter, "AR 350-19"), ECF No. 252-4 at 71 (citing 10 U.S.C § 101(e)(5)(A) through (C)).

"Beginning in 2001, the Army became subject to litigation with Malama Makua, a non-profit group dedicated to preserving Makua Valley for culturally appropriate use and protecting the existing archaeological sites." ECF No. 252-1 at 10 (citing *Malama Makua v. Rumsfeld*, Civil No. 00-00813 SOM/LEK (2001)). As a result of this litigation, the Army was required to allow Native Hawaiians to access MMR and also required the Army to "maintain and control vegetation in the areas that would be accessed for cultural use given UXO." *Id*. at 10–11. The Army thus contracted independent contractor, Nugate Group, LLC, ("Nugate") to perform vegetation maintenance on MMR. *Id*. at 13–15.

According to Plaintiffs' Second Amended Complaint, Nugate had a contract with the Army between 2013 and 2015, "to perform ground maintenance, primarily

cutting grass and shrubs with weed trimmers within MMR."  ECF No. 247 at 4 ¶

10.  Plaintiffs were laborers employed by Nugate to perform such ground

maintenance.  *See* ECF No. 261-1 at 2 ¶ 3; ECF No. 261-2 at 2 ¶ 3.

Plaintiffs allege that on "April 6, 2015, Plaintiffs were performing ground

maintenance within an area of MMR that the Army represented to them as cleared

of UXO."  ECF No. 247 at 5 ¶ 13.  Plaintiffs allege that "Plaintiff Eleodoro Garcia

was using a commercial grade weed trimmer to cut tall grass when it contacted an

UXO, causing the UXO to explode."  *Id*.  The explosion caused personal injuries

and damages to both Plaintiffs.  *Id*.

B.     Procedural History

1.  The Initial Complaints

Plaintiffs filed their initial complaint on December 11, 2019.  ECF No. 1.

Since then, the parties have been embroiled in a fair amount of litigation, including

a trip to the Ninth Circuit.  The Court provides a précis of the procedural history

relevant to the motion before the Court.

After Plaintiffs filed their initial complaint on December 11, 2019, Plaintiff-

Intervenor Everest National Insurance Co. ("Everest") filed its First Complaint in

Intervention on April 16, 2020 ("Everest Complaint").  ECF No. 21.  The

Government subsequently filed a motion to dismiss both Plaintiffs' initial

complaint and the Everest Complaint.  *See* ECF No. 134.  The Court granted the

motion to dismiss on April 28, 2021 ("04/28/2021 Order"), and the Clerk entered judgment in the case.  ECF Nos. 155, 156.

Plaintiffs and Everest thereafter filed post-judgment motions for reconsideration and leave to amend, *see* ECF Nos. 158–59, which the Court denied on June 14, 2021, and July 13, 2021, respectively, *see* ECF Nos. 166, 172. Plaintiffs and Everest appealed the matter to the Ninth Circuit Court of Appeals. *See* ECF No. 167.

On September 12, 2022, the Ninth Circuit issued a Memorandum affirming in part, reversing in part, and remanding the case back to this Court.  ECF No. 184. The Ninth Circuit affirmed the 04/28/2021 Order; however, the Ninth Circuit held that the Court had erred in dismissing the initial complaint without leave to amend and thus, reversed the Court's denial of Plaintiffs' and Everest's post-judgment motions.  *Id*. at 5.  The Ninth Circuit remanded with instructions to grant Plaintiffs and Everest leave to amend their respective complaints.  *Id*. at 5–6.

2.  The First Amended Complaints

Plaintiffs and Everest both filed a First Amended Complaint ("FAC") on October 22, 2022, and November 3, 2023, respectively.  *See* ECF Nos. 189, 192. Everest asserted various negligence claims against the Government and also sought a subrogation judgment.  ECF No. 189 at 12–20.  The Government filed a motion for partial dismissal of Everest's FAC on February 13, 2023, asserting that this

Court lacked subject-matter jurisdiction because: (1) Everest had failed to exhaust administrative remedies under 28 U.S.C. §§ 2401 and 2675(a); and (2) Everest lacked standing to bring negligence claims under Hawaiʻi's workers compensation law, namely Hawaiʻi Revised Statutes § 386-8.  *See* ECF No. 213.  The Court granted the Government's motion for partial dismissal, explained that Everest only maintained its subrogation claim for reimbursement, and limited Everest's discovery to its subrogation liens when ripe for determination.  ECF No. 230.

   3.  The Second Amended Complaint

   After the Court: (1) granted two motions to amend the Rule 16 Scheduling Order filed by Plaintiffs so that Plaintiffs could amend their First Amended Complaint, *see* ECF Nos. 237, 246; and (2) denied as moot Defendant's motion to dismiss Plaintiffs' First Amended Complaint, *see* ECF No. 246, Plaintiffs filed their Second Amended Complaint on August 16, 2023, *see* ECF No. 247.  The Second Amended Complaint ("Complaint") is the operative complaint in this action.

   The Government filed its Motion to Dismiss Plaintiffs' Complaint on September 27, 2023 ("Motion").  ECF No. 252.  Plaintiffs opposed the Motion on November 8, 2023, ECF No. 261, and Everest filed a substantive joinder to the Plaintiffs' Opposition, ECF No. 262.  The Government asked the Court to strike the Everest joinder, *see* ECF No. 266, which the Court denied, ECF No. 268;

6

however, the Court elected to construe the substantive joinder as a joinder of simple agreement.  ECF No. 268.  The Government filed its Reply on November 29, 2023.  ECF No. 264.

The evening before the hearing on the Motion, Plaintiffs filed a motion seeking leave to file a surreply to the Government's Reply.  *See* ECF No. 269.

The Court held a hearing on the Motion on November 30, 2023.  ECF No. 270.  Harry Yee, Esq., and Major Adam Bradley, Esq., appeared on behalf of the Government.  Roger I. Hoffman, Esq., appeared on behalf of Plaintiffs.  Saori Page Takahashi, Esq., appeared on behalf of Everest.  The Court denied Plaintiffs' motion for leave to file a surreply at the hearing.

## III.  LEGAL STANDARD

A.     The Dispute

The Government brings its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).  *See* ECF No. 252-1 at 17–18.  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id*.  "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id*.

Plaintiffs and the Government dispute whether the Government's jurisdiction attack is facial or factual. Plaintiffs assert that the Government's attack is factual while the Government contends its attack is facial. *See* ECF No. 252-1 at 9; ECF No. 261 at 11; ECF No. 264 at 7. The distinction between whether the jurisdictional attack is facial or factual is of import because of the different standards that apply depending on what type of attack a motion to dismiss launches.

In resolving a factual attack on jurisdiction: (1) "the district court may review evidence beyond the complaint," including matters of public record, "without converting the motion to dismiss into a motion for summary judgment;" (2) the district court "need not presume the truthfulness of the plaintiff's allegations;" and (3) "[o]nce the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Meyer*, 373 F.3d at 1039 (citing *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).

In contrast, because the decision of whether subject matter jurisdiction exists in a facial attack does not depend on resolution of a factual dispute but rather on

the allegations in a complaint, a district court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  Accordingly, the court accepts "the plaintiff's allegations as true" and draws "all reasonable inferences in the plaintiff's favor" in determining "whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."  *Id.*; *see also Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (assuming the plaintiff's allegations to be true and drawing all reasonable inferences in plaintiff's favor in deciding a motion to dismiss that was based on a Rule 12(b)(1) facial attack).

Plaintiffs allege that Army Regulation ("AR") 350-19 and other regulations required the Army to provide Explosives Ordnance Disposal ("EOD") support to Plaintiffs while they performed their daily maintenance and grass cutting duties within MMR.  ECF No. 247 at 4 ¶ 11; *see also* ECF No. 247 at 12 ¶ 29 ("[T]he [United States Army Technical Center for Explosives and Safety] safety policies and regulations required the Army to provide Plaintiffs with UXO/EOD; the Army failed to provide the required UXO/EOD support to Plaintiffs.").  The Government contends that Plaintiffs' allegations are incorrect, arguing that "Plaintiffs cite to regulatory provisions that are expressly discretionary or inapplicable to the Plaintiffs' claims."  ECF No. 252-1 at 22.  The Government thus avers that the Court lacks jurisdiction pursuant to the DFE of the FTCA.  *Id*. at 18–19.

In other words, the Government does not, for purposes of this Motion, dispute the factual allegations in the Complaint.  Instead, it challenges a legal allegation – that the DFE is inapplicable because AR 350-19 provides a mandatory duty to provide EOD support.  The Court is thus persuaded that the Government's motion to dismiss presents a facial attack on the Complaint.  *See Wolfe*, 392 F.3d at 362 (concluding that the defendants had made a facial attack because the existence of subject matter jurisdiction did not depend "on resolution of a factual dispute, but rather on the allegations in [the plaintiff's] complaint"); *see also Doe v. Holy See*, 557 F.3d 1066, 1071 (9th Cir. 2009) (concluding that the defendant had brought a facial attack under Rule 12(b)(1) where the defendant sought dismissal based on its contention that it was presumptively immune from suit under the Foreign Sovereign Immunities Act's tortious act exception to sovereign immunity).

The Court is also persuaded that analyzing the Motion as a facial attack is proper because the Ninth Circuit has explicitly held that "[a]ll of the factual allegations in the plaintiff's complaint are to be taken as true in reviewing a discretionary function exception dismissal under the FTCA."  *O'Toole v. United States*, 295 F.3d 1029, 1032 (9th Cir. 2002) (citing *Berkovitz v. United States*, 486 U.S. 531, 540 (1988) (holding that because the decision it reviewed adjudicated a motion to dismiss on the ground that the agency action's fell within the DFE of the FTCA, it accepted all of the factual allegations in petitioners' complaint as true and

asked whether, in those circumstances, "dismissal of the complaint was appropriate").

B.      The Applicable Standard

As discussed above, the Court resolves this "facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the [Plaintiffs'] allegations as true and drawing all reasonable inferences in [their] favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite*, 749 F.3d at 1121 (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).  Although the Court must accept "all of the *factual* allegations in a complaint as true," it is not required "to accept *legal conclusions* in the complaint as true, even if 'cast in the form of factual allegations.'"  *Lacano Invs., LLC v. Balash*, 765 F.3d 1068, 1071 (9th Cir. 2014) (emphases in original) (quoting *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that the tenet that a court, on a motion to dismiss, "must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions").

Unlike a Rule 12(b)(6) motion, however, "[o]n a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), proof of jurisdictional facts may be supplied by affidavit, declaration, or any other evidence properly before the court, in addition to the pleadings challenged by the motion."  *Green v.*

*United States*, 630 F.3d 1245, 1248 n.3 (9th Cir. 2011) (citation omitted). When considering items outside the pleadings, the district court "resolve[s] all disputes of fact in favor of the non-movant." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996), *as amended* (Feb. 4, 1997).

Finally, "[w]hen the discretionary function exception is invoked, the government bears the burden of establishing that the discretionary function exception applies." *Cabalce v. VSE Corp.*, 914 F. Supp. 2d 1145, 1157–58 (D. Haw. 2012) (citing *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005); *Marlys Bear Med. v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001)); *see also Lam v. United States,* 979 F.3d 665, 673 (9th Cir. 2020) ("The government has the burden to prove this defense, so to win dismissal, it must show that the DFE applies because the employee's acts were discretionary." (citation omitted)).

## IV.  DISCUSSION

A.    Overview of the FTCA and the DFE

The Federal Tort Claims Act provides a limited waiver of the sovereign immunity that Government employees are generally afforded.  Under the FTCA, district courts have jurisdiction over civil actions against the Government (i) seeking money damages for "personal injury or death caused by the negligent or wrongful act or omission" of any Government employee; (ii) while acting within the scope of their employment; (iii) "under circumstances where the United States,

if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA's waiver of sovereign immunity is, however, limited by a number of exceptions, one of which is the DFE.

The DFE to the FTCA is reflected in 28 U.S.C. § 2680(a), and provides which claims cannot go forward, i.e., tort claims in which the alleged tortfeasor was performing a discretionary function or duty when he injured the plaintiff:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused.

Accordingly, even if a plaintiff could establish the three conditions under 28 U.S.C. § 1346(b)(1), where the DFE applies, "the United States has not waived its sovereign immunity, and the district court lacks subject matter jurisdiction over a plaintiff's claim." *Lam*, 979 F.3d at 672. "This is true even if the employee abused that discretion." *Id*. (citing 28 U.S.C. § 2680(a)). "If the government can show that the alleged injury arose out of the employee's discretionary acts, then the district court must dismiss plaintiff's case." *Id*.

13

B.      The Two-Step Application in this Action

The Government invokes the DFE to defeat Plaintiffs' claims, arguing that the regulatory provisions Plaintiffs cite in the Complaint are "expressly discretionary or inapplicable to the Plaintiffs' claims."  ECF No. 252-1 at 22.  The critical disputed issue in this Motion is thus whether these provisions allowed the Government discretion in choosing which course of action to take with respect to Plaintiffs' claims.

In deciding whether the DFE applies in an action, a court asks two questions: (1) Did the relevant "federal statute, regulation, or policy" (collectively, "Federal Policies") allow for discretion?; and 2) Were those Federal Policies susceptible to the policy analysis the DFE was designed to protect? (together, "the DFE Test").  *Lam*, 979 F.3d at 678; *see also Berkovitz*, 486 U.S. at 536 (providing that the DFE applies where the "challenged conduct involves an element of judgment," and where "that judgment is of the kind that the discretionary function exception was designed to shield"); *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (same).  The Court must answer both questions in the affirmative for the DFE to apply.

If Federal Policies do not allow for discretion, i.e., provide a mandatory course of action, the inquiry stops and the suit may proceed.  *Berkovitz*, 486 U.S. at 536 ("And if the employee's conduct cannot appropriately be the product of

14

judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." (citation omitted)).  If, however, Federal Policies allow for discretion, the Court must proceed to the second question of the DFE Test because the DFE, "properly construed," protects only "governmental actions and decisions based on considerations of public policy."  *Id*. at 537 (citation omitted); *see also id*. at 536 (holding that "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield").

    1.  Discretionary or Mandatory

      As discussed above, the first step of the DFE Test requires this Court to resolve whether the challenged conduct is discretionary, to wit, involved an element of judgment or choice.  Where Federal Policies "specifically prescribe[] a course of action for an employee to follow" and the offending conduct violates this mandatory directive, it is not a discretionary act because the employee "has no rightful option but to adhere to the directive."  *Id*. at 536.  "Thus, discretion is the benchmark of this self-referential prong of the discretionary function test." *GATX/Airlog Co*., 286 F.3d 1168, 1174 (9th Cir. 2002).  The Court presents its analysis by identifying the challenged conduct and reviewing the relevant Federal Policies to determine if the challenge conduct was discretionary or mandatory.

a. The Conduct at Issue

According to Plaintiffs' Complaint, the conduct at issue is the Government's failure to provide "EOD support" or "UXO/EOD support" to Plaintiffs while Plaintiffs "performed their daily maintenance and grass cutting duties within MMR." ECF No. 247 at 4 ¶ 11; ECF No. 247 at 12 ¶ 29. Plaintiffs allege that the relevant Federal Policies requiring such support are in AR 350-19, the Department of the Army Pamphlet ("DA Pam") 385-63 (2014) and DA Pam 385-64 (collectively, "the DA Pams"),[1] and the 2005 MMR Risk Assessment Report ("2005 Report"). Plaintiffs assert that these policies present mandatory directives for establishing range control and explosive safety and ensuring the safe conduct of military and civilian personnel and contractors involved in training operations. *See* ECF No. 247 at 6; *see also* ECF No. No 247 at 6–11 (listing: AR 350-19 ¶¶ 4-8(e), 4-12(a)–(b); the DA Pams; and 2005 Report).

---

[1] Defendant attaches DA Pam 385-63 (April 2014) to its Motion to Dismiss as Exhibit "4." *See* ECF No. 252-6. Plaintiffs cite to DA Pam 385-64 (2014) however, they do not attach this regulation. Moreover, the Court is unable to find a 2014 version of DA Pam 385-64. *See* ECF No. 261 at 17. Instead, the Court cites to DA Pam 385-64 (May 2011) in this Order, which was the pamphlet in effect at the time Plaintiffs were injured. https://www.wbdg.org/FFC/ARMYCOE/ARMYCRIT/pam38564.pdf (last visited December 21, 2023). The Court notes that DA Pam 385-64 (May 2011) has since been superseded by DA Pam 385-64 (July 2023) and that this 2023 version explicitly states that it supersedes DA Pam 385-64 (May 2011). *See* https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN31050-PAM_385-64-000-WEB-1.pdf (last visited December 21, 2023).

16

AR 350-19 ¶ 4-8 provides that "[g]arrison commanders are responsible for establishing range control and explosives safety programs, in accordance with [DA Pams], and ensuring the safe conduct of military and civilian personnel and contractors involved in training operations."  ECF No. 252-4 at 40.  Section 4-8(e) of AR 350-19 provides that "garrison commanders will[,]" among other things, "[p]rohibit access to areas known or suspected to contain UXO, except to personnel authorized to perform specific range-related actions[,]" but "[w]here access is necessary, either provide UXO avoidance support or remove UXO, in accordance with safety procedures and other relevant requirements."  *Id*. at 41.

The Government exercised its discretion to provide UXO avoidance support rather than to remove UXOs in this case; however, in analyzing whether the DFE applies, "[t]he proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance."  *In re Glacier Bay*, 71 F.3d at 1451.  Thus, even if the Army had discretion to "provide UXO avoidance support or remove UXO" under AR 350-19, the inquiry does not end.  *Id*. ("We reject the district court's conclusion that the government cannot be liable for the final product of numerous specific actions, even if some of the actions were nondiscretionary and negligently executed, so long as others of those actions involved discretion.").

Instead, once the Army made its decision to provide one or the other, the Court must examine "[e]ach separate action" alleged by Plaintiffs to determine "whether the specific actor had discretion of a type Congress intended to shield." *Id.* "[T]he proper level of inquiry must be act by act." *Id.*; *see also Sutton v. Earles*, 26 F.3d 903, 907 (9th Cir. 1994) ("We must examine separately [each claimed negligent act]." (alterations in original) (quoting *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1025 (9th Cir. 1989) (examining separately the government actor's alleged negligence in designing an irrigation canal and their alleged negligence in constructing the canal)).

The Court thus examines whether the Army, once it decided not to remove UXOs, provided "UXO avoidance support . . . in accordance with safety procedures and other relevant requirements," AR 350-19 ¶ 4-8(e), and whether these safety procedures and other relevant requirements were mandatory.

b.   The Relevant Federal Policies

The Government contends that AR 350-19 is "permissive in nature" and "grants the Army broad latitude to determine the type of UXO avoidance support necessary for a given circumstance." ECF No. 252-1 at 24 (citing AR 350-19 ¶ 4-15(b)). The Government asserts that "the Army determined that the appropriate UXO avoidance support for some authorized, infrequent visitors required escorts at MMR while the Plaintiffs, who frequently worked on the facility, would receive a

18

one-hour high explosives safety briefing." *Id*. at 25.  The Government thus avers

that the kind of support to provide individuals when access is necessary is a

discretionary decision and thus, its decision to provide the video instead of escorts

is immune from liability pursuant to the DFE.  *Id*. at 24–25.  The Government

insists that "[n]o statute, policy, or regulation requires a different decision."  *Id*.

The Court disagrees.

 In support of its contention that AR 350-19 is "permissive in nature"

and grants the Army "broad latitude" to determine what type of UXO avoidance

support to provide, the Government cites to AR 350-19 ¶ 4-15(b).  Chapter 4,

Section III, paragraph 4-15 is titled "Impact areas," and provides, among other

things, that "[a]ccess to dedicated or temporary dudded impact areas is restricted to

mission essential activities and will be coordinated in advance with the controlling

range office."  ECF No. 252-4 at 42, AR 350-19 ¶ 4-15(b).  It also provides that

"[a]ppropriate operational clearing of UXO, UXO avoidance, or UXO escort

support is accomplished before entry, except during emergencies, such as in the

event of aircraft mishaps, life threatening, or safety related situations."  *Id*.

 Nothing in this regulation provides that AR 350-19 is "permissive in

nature," nor does this regulation indicate that the Army is given broad latitude in

determining what type of UXO avoidance support to provide.  Instead, it indicates

that there are "appropriate" actions required before entry into dedicated or

temporary dudded impact areas, and that such decision must be made before entry except in emergencies.  ECF No. 252-4 at 42, AR 350-19 ¶ 4-15(b).

The Ninth Circuit directs courts to look at all the relevant policies involved in the government's conduct at issue "in their totality and how they fit together to determine if they are discretionary or mandatory." *Lam*, 979 F.3d 665, 676 (9th Cir. 2020).  In determining what is the "appropriate action" in a given situation, the Court finds that there are several provisions in AR 350-19 that reflect mandatory directives related to what type of UXO avoidance support or UXO escort support the Government is required to provide in areas suspected or known to contain ammunition and explosives.

First, as discussed above, Section 4–8(e) states that the garrison commander will "either provide UXO avoidance support or remove UXO, in accordance with safety procedures and other relevant requirements."  Section 4-8(e) does not, however, provide any definition for "UXO avoidance support."  Indeed, AR 350-19 references other types of support, e.g., "EOD support," AR 350-19 ¶ 4-12(g), "UXO avoidance," and "UXO escort support," AR 350-19 ¶ 4-15(b), but does not define what they entail.

Notably, however, there are sections that require a specific type of support. For example, AR 350-19 ¶ 4-12(g) provides that, "[b]efore conducting range clearance operations, installations will conduct a hazard and risk assessment in

accordance with DA Pam 385–64."  It also states that "[i]nstallations will acquire range clearance or EOD support for range operations or activities that involve disturbance or removal of soil in areas known or suspected of containing UXO." AR 350-19 ¶ 4-12(g).

Plaintiffs allege that "Plaintiff Eleodoro Garcia was using a commercial grade weed trimmer to cut tall grass when it contacted an UXO, causing the UXO to explode."  ECF No. 247 at 5 ¶ 13.  Accepting Plaintiffs' allegation as true and drawing all reasonable inferences in their favor, Plaintiff Garcia was engaged in an activity involving "disturbance or removal of soil in areas known or suspected of containing UXO."  Indeed, Plaintiffs attach Plaintiff Jonathan Abell's deposition to their Opposition, which the Court may consider for jurisdictional facts, *see Green*, 630 F.3d at 1248 n.3.  *See* ECF No. 261-7.

At his deposition, Plaintiff Abell was asked, "And these weed whackers cause a lot of vibration, don't they?" and "And if you touch a weed whacker to the ground, it causes intense vibration, don't they?"  ECF No. 261-7 at 10, Jonathan Abell Dep. 34:6–34:11.  Mr. Abell responded "yes" in response to both questions. *Id*.; *see also* ECF No. 261-6 at 10, Joe Abell Dep. 35:1–35:6 (deposing Plaintiff Jonathan Abell's brother: "Q. When you used this weed whackers, they cause a lot of vibration; is that right? A. Yes, sir.  Q. And when you touch them to the ground, they increase ground vibration; is that right? A. Yes, sir.").  Accordingly, AR 350-

21

19 ¶ 4–12(g) appears to mandate that the Army was required to "acquire range clearance or EOD support" before Plaintiffs were permitted to access the soil.

Notably, EOD means "explosive ordnance disposal" and AR 350-19 defines it as "[t]he detection, identification, on-site evaluation, rendering safe, recovery, and final disposal of unexploded ordnance and of other munitions that have become an imposing danger, for example, by damage or deterioration." ECF No. 252-4 at 66. It thus appears that AR 350-19 ¶ 4-12(g) required more than a one-hour briefing on High Explosive and Fire Preventive Safety before Plaintiffs were permitted to cut the grass; it required range clearance or explosives ordnance disposal support if Plaintiffs would be disturbing any soil.

Second, AR 350-19 ¶ 4-12(h) provides that "installations will comply with escort requirements during all range clearance operations and maintenance activities in areas known or suspected of containing UXO." ECF No. 252-4 at 42. It appears that at least some of the "escort requirements" and also, "safety procedures and other relevant requirements" related to what type of support to provide, *see* AR 350-19 ¶ 4-8(e), are found in the DA Pams. *See* AR 350-19 ¶ 4-8 ("Garrison commanders are responsible for establishing range control and explosives safety programs, in accordance with DA Pam 385–63 and DA Pam 385–64 . . . ."); AR 350-19 ¶ 4-12(g) ("Before conducting range clearance operations, installations will conduct a hazard and risk assessment in accordance

with DA Pam 385–64.").  Indeed, AR 350-19 explicitly references the DA Pams for policies, procedures, responsibilities, and standards for "range safety" and "explosives safety."  AR 350-19 ¶ 1-5.

DA Pam 385-64 "applies to . . . all persons at any time on an Army installation."  DA PAM 385-64 at p.i (May 2011).  Of note is that section 1-4 of DA Pam 385-64 states that "[t]his pamphlet includes mandatory procedures and guidance as well as preferred and acceptable methods of accomplishment."  It also provides how to discern when a requirement is (1) mandatory, (2) optional or preferred, or (3) acceptable or suggested:

> a. The words "shall," "will," and "must" are used to state mandatory requirements.  Deviation from these provisions requires a DA Form 7632 per provisions of AR 385-10 and DA Pamphlet (DA Pam) 385-30.
> b. The word "should" indicates an optional or preferred method of accomplishment. Deviation from these provisions requires written authorization from the local commander/senior manager or designee.
> c. The word "may" indicates an acceptable or suggested means of accomplishment.

DA Pam 385-64 ¶ 1-4 (May 2011).

The Court concludes that the DA Pams contain a number of mandatory provisions that may apply to the Government's duties with respect to Plaintiffs' access to MMR.  Section 19-3 of DA Pam 385-64, titled "Identification and control of areas known or suspected to contain munitions and explosives of concern," provides that army installations will "[d]evelop guidelines to determine when

individuals, who for operational reasons (for example, environmental monitoring), are authorized access to areas under Army or [Department of Defense] control that are known or suspected to contain [Munitions and Explosives of Concern ("MEC")], must be escorted into the area."  DA Pam 385-64 ¶ 19-3(e)(2).

The development of guidelines to determine when individuals must be escorted is, therefore, not permissive; rather, DA Pam 385-64 explicitly provides it is a mandatory requirement and that in some instances, individuals must be escorted.  It is unclear, however, that the Army developed any of these guidelines in determining that Plaintiffs would not require escorts.  Indeed, the Government suggests that the decision to provide escorts or not is entirely discretionary.  ECF No. 252-1 at 25.  DA Pam 385-64 ¶ 19-3(e)(2), however, imparts a different conclusion.

Next, DA Pam 385-63 ¶ 2-12, titled "Army requirements for areas known to contain improved conventional munitions [("ICM")] and submunitions," contains a section that provides "[m]andatory requirements for operational ranges, training facilities, or maneuver areas known or suspected to contain ICM and sub-munitions."  *See* DA Pam 385-63 ¶ 2-12(c), ECF No. 252-6 at 26.

The Government acknowledges that this provision is mandatory, *see* ECF No. 252-1 at 13 n. 2; ECF No. 252-1 at 28, but it argues that "it is entirely inapplicable to the alleged facts" in the Complaint because Plaintiffs neither assert

that the area where they were performing lawn maintenance duties was known or suspected to contain ICMs or submunitions nor do they allege that they were injured by an ICM or submunition.  ECF No. 252-1 at 27–28.  This, however, is not a proper basis to dismiss a complaint on a facial attack under Rule 12(b)(1).

As discussed in the Legal Standard section of this Order, the Government maintains that its Motion to Dismiss launches a facial attack (and the Court agrees).  Thus, in deciding the Motion, the Court must accept the Plaintiffs' allegations as true and draw all reasonable inferences in their favor.  Plaintiffs explicitly cite DA Pam 385-63 ¶ 2-12 and discuss protocols related to areas known or suspected to contain ICMs and submunitions.  *See* ECF No. 247 at 7–8 ¶¶ 19–20; ECF No. 247 at 10 ¶ 26.  A reasonable inference is that Plaintiffs are alleging that the area in which they were injured was an area known or suspected to contain ICMs and submunitions.

The Government does not directly refute this contention; rather, it takes issue with how Plaintiffs have presented this allegation in their Complaint and challenges the facts alleged in the Complaint.  The Court need not assess factual challenges of plausible claims in deciding jurisdiction on this particular motion.  The Court's sole focus on a motion to dismiss under Rule 12(b)(1) based on the DFE is to ask "whether the allegations state a claim sufficient to survive a motion

to dismiss." *Gaubert*, 499 U.S. at 327.  The Court concludes Plaintiffs' allegations do.

Plaintiffs allege that the Army's decision on what type of UXO avoidance support to provide Plaintiffs was controlled by mandatory statutes or regulations. Plaintiffs have cited to mandatory provisions in AR 350-19 and the DA Pams that sufficiently support this allegation.  Accordingly, the Court concludes the allegations in the Complaint are sufficient on its face to invoke federal jurisdiction.

c.  The 2005 Report

Lastly, the Court would be remiss not to address the hotly disputed significance of the 2005 Report.  *See* ECF No. 261-5.  At this time, the Court finds that the 2005 Report is not the type of mandatory "federal statute, regulation, or policy" requiring any action by the Government.  It is simply a risk assessment as reflected in its title.  Indeed, its self-proclaimed purpose "is to thoroughly analyze the risks to unrelated personnel from Munitions and Explosives of Concern (MEC) remaining in the areas where access is currently allowed for cultural and natural resources purposes."  ECF No. 261-5 at 6.  It did not, as AR 350-19 or the DA Pams did, mandate any Government action.

This is not to say, however, that the 2005 Report was not later used to establish mandatory requirements or policy in some other form, but that document is not before the Court.  The Government represented at the hearing that it was

uncertain of what the 2005 Report was used for after it was approved.  Plaintiffs

have the benefit of discovery to determine the significance of the 2005 Report and

what mandatory requirements, if any, may have come of it, but at this stage of the

litigation, the Court rejects its use in the Complaint to establish any mandatory

requirements.

The Court concludes that the Government fails to carry its burden of proving

that DFE applies.  The Government does not cite to any provision that

demonstrates that, once it decided not to remove the UXOs, it had unbridled

discretion on what kind of support to provide and whether to provide escorts or

not.  Plaintiffs on the other hand, plead enough to survive a motion to dismiss by

alleging that there were mandatory provisions that prescribed a specific course of

action that the Government failed to follow.

Even if the Government's disputed action was in fact discretionary,

however, the Court concludes that the Government fails to establish that its

decision on what type of "UXO avoidance support" to provide Plaintiffs was

susceptible to the type of policy analysis the DFE protects.

2.  Considerations of Public Policy

The Court concludes that Plaintiffs' allegations are sufficient as a legal

matter to invoke the Court's jurisdiction because the Complaint plausibly alleges

that there may be mandatory provisions that directed the course of the

27

Government's decisions with respect to Plaintiffs.  Accordingly, as discussed previously, the inquiry may stop and the suit may proceed because "there is no discretion in the conduct for the discretionary function exception to protect."  *See Berkovitz*, 486 U.S. at 536.  Nonetheless, for the sake of completeness, the Court will proceed to the second step of the DFE Test and examine whether the Government's decision to provide the type of UXO avoidance support it did to Plaintiffs was "susceptible to a policy analysis grounded in social, economic, or political concerns."  *Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998).

Under the second step of the DFE Test, even if the government's challenged conduct involves discretion, a plaintiff can still prevail if "the government's decision was not 'susceptible to a policy analysis grounded in social, economic, or political concerns.'"  *O'Toole*, 295 F.3d at 1035 (quoting *Miller*, 163 F.3d at 595).

The Ninth Circuit has acknowledged that "reconciling conflicting case law in this area can be difficult."  *O'Toole*, 295 F.3d at 1035 (citing *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 811 (1984) (noting that "the Court's reading of the [FTCA] has admittedly not followed a straight line"); *Shansky v. United States*, 164 F.3d 688, 693 (1st Cir. 1999) (observing that the "case-by-case approach" of this second prong "has led to some disarray," and citing cases whose holdings are in direct conflict).  Indeed, while the extreme

examples of this policy prong of the DFE analysis are simple to identify, the cases in the middle of the spectrum prove to be more difficult.

On one extreme are decisions where the DFE provides no defense, i.e., decisions "totally divorced from the sphere of policy analysis," and on the other extreme are decisions "fully grounded in regulatory policy, where the government employee's exercise of judgment is directly related to effectuating agency policy goals. *O'Toole*, 295 F.3d at 1035 (9th Cir. 2002) (comparing a government official who drives negligently, causing an accident – no public policy considerations – to the other extreme, regulation and oversight of savings and loans by the Federal Home Loan Bank Board, *see Gaubert*, 499 U.S. at 332–34; the release of vaccine lots by the Bureau of Biologics of the Food and Drug Administration, *see Berkovitz*, 486 U.S. at 545–48; and the enforcement and implementation of airline safety standards by the Federal Aeronautics Agency, *see Varig*, 467 U.S. at 814–20)).  The instant case falls in the middle of the spectrum and thus, compels a more demanding inquiry.

In examining this second prong, the Court is mindful of the Ninth Circuit's instruction that the "inquiry into the nature of a decision is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield." *Bear Med.*, 241 F.3d at 1216.  "[T]he Government has the burden of proving the discretionary function exception applies, *see Prescott*

29

[*v. United States*], 973 F.2d [696,] [] 702 [9th Cir. 1992], and this is not done by mere subjective statements." *Id*. "There must be reasonable support in the record for a court to find, without imposing its own conjecture, that a decision was policy-based or susceptible to policy analysis." *Id*.

Here, the Government argues that its "discretionary conduct was informed by policy considerations." ECF No. 252-1 at 29. The Government asserts that "[e]stablished Army policies for range management and safety vested in responsible Army officials the discretion to decide what type of UXO avoidance support was appropriate for a given situation." *Id*. at 30. The Government contends that it is not "simple" to provide EOD escorts to Plaintiffs every time lawn maintenance is performed on MMR because EOD specialists are highly trained, in short supply, and from 2013–2015, were an indispensable resource supporting the war efforts in Iraq and Afghanistan." *Id*. The Government thus asserts that in "[b]alancing risks to safety and resource limitations, the Army chose to exercise the discretion afforded in Army policy by contractually requiring Nugate employees to participate in UXO safety training prior to gaining access to MMR." *Id*. at 31.

The Government also contends that staffing of MMR was informed by policy considerations. *Id*. The Government argues, "[i]t is well known that the Department of Defense faced significant budgetary limitations in 2013 as a result

of sequestration spending reductions." *Id*.  The Government maintains that "[i]t was under these conditions that the Army chose to replace civilian workers with borrowed military manpower." *Id*.

The Government thus provides staffing shortages and budgetary limitations as the "policy considerations" that drove its decision to provide a specific type of UXO avoidance support.  The Court concludes that the Government fails to demonstrate how these judgments are "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.  The Court finds support for this conclusion in a number of Ninth Circuit decisions evaluating government decisions regarding safety.

In *O'Toole v. United States*, the Ninth Circuit concluded that it was not aware of any statute or regulation that mandated the adequate maintenance of the Bowler Ranch irrigation system by the government actor, the Bureau of Indian Affairs ("BIA").  *O'Toole*, 295 F.3d at 1034.  The court thus concluded that, "[b]ecause the government did not deviate from actions or policies mandated by statute or regulation in failing to adequately maintain the Bowler Ranch irrigation system, the BIA's irrigation repair decisions were the product of choice, protected under the first part of the discretionary function exception test." *Id*. at 1035.

Notwithstanding the court's conclusion that the BIA's decision was discretionary, the *O'Toole* court held that the DFE did not apply because the BIA's

31

decision not to repair the irrigation system failed under the second prong of the

DFE Test.  The court found that BIA advanced "no other reason for its actions or

inactions aside from the choice to spend its limited funds in other ways." *Id*. at

1036.  In support of this conclusion, the court relied on its holding in *ARA Leisure*

*Servs. v. United States*, 831 F.2d 193, in which a tour bus company had sued the

United States and the National Park Service for negligent design and maintenance

of a road.  *O'Toole*, 295 F.3d at 1036.

In *ARA Leisure Services v. United States*, the government contended that

road maintenance decisions required consideration of funding constraints and other

factors; thus, these decisions were protected under the second prong of the DFE

Test.  The Ninth Circuit disagreed.

The court held that "the failure to maintain [the road] in a safe condition"

was not "a decision grounded in social, economic, or political policies." *ARA*

*Leisure Servs*, 831 F.2d at 195.  The *O'Toole* Court explained that, in *ARA Leisure*,

"the fact that Park Service maintenance personnel were required to work within a

budget [did] not make their failure to maintain[the road] [sic] a discretionary

function for purposes of the FTCA." *Id*. (alterations in original) (quoting *ARA*

*Leisure*, 831 F.2d at 195).  On the contrary, considerations such as "allocation of

funds" "was not a policy decision 'of the nature and quality that Congress intended

to shield from tort liability' under the second prong of the discretionary function exception analysis." *Id*. (quoting *ARA Leisure*, 831 F.2d at 196).

The *O'Toole* Court, faced with a similar argument from the government, held that the BIA's decision to forego, "for fiscal reasons, the routine maintenance of its property—maintenance that would be expected of any other landowner—[was] not the kind of policy decision that the discretionary function exception protects." *Id*. at 1036.

Here, insofar as the Government argues that the staffing of MMR was informed by policy considerations, but lists "significant budgetary limitation" as its only consideration, the Ninth Circuit has already rejected the notion that this type of judgment is "'of the nature and quality that Congress intended to shield from tort liability' under the second prong of the discretionary function exception analysis." *O'Toole*, 295 F.3d at 1036 (quoting *ARA Leisure Servs.*, 831 F.2d at 196); *see also Whisnant*, 400 F.3d at 1184 ("[W]e decline to permit the government to use the mere presence of budgetary concerns to shield allegedly negligent conduct from suit under the FTCA.").

Next, as to the Government's assertion that policy considerations drove its decision not to supply provide military or EOD escorts to Plaintiffs because EOD specialists were in short supply and indispensable for certain war efforts, the Court finds this argument unconvincing.  Drawing all reasonable inferences in their

favor, Plaintiffs do not allege that EOD escorts are the only type of UXO avoidance support the Government was required to provide them.  They allege that UXO-qualified personnel could have escorted them.  *See* ECF No. 247 at 8 ¶ 20. They also allege that the Army failed to provide the "required UXO/EOD support," which could reasonably implicate something other than EOD escorts.  *Id*. at 12 ¶ 29.

Although the Government had discretion to "either provide UXO avoidance support or remove UXO," once it exercised its discretion to provide UXO avoidance support, the Army was obligated to provide such support "in accordance with safety procedures and other relevant requirements."  AR 350-19 ¶ 4-8(e).  As the Ninth Circuit has summarized: "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not. . . .  [S]afety measures, once undertaken, cannot be shortchanged in the name of policy."  *Whisnant*, 400 F.3d at 1182 (quoting *Bear Med.*, 241 F.3d at 1215, 1216–17).

Every regulation cited by Plaintiffs in their Complaint highlight safety over resource or budget considerations.  *See* ECF No. 247 at 6–8.  The Government, however, fails to point to any policy or regulation that supports the Government's contention that the kind of safety precautions to provide should include consideration of allocation of resources or budgetary concerns.  *See e.g.*, *ARA*

34

*Leisure Servs.*, 831 F.2d at 195 ("[T]he decision to design and construct Denali Park Road without guardrails was grounded in social and political policy" because the "government has shown a clear link between this decision and Park Service policies requiring that roads be designed to be 'esthetically pleasing [and to] . . . lie[ ] lightly upon the land utilizing natural support wherever possible." (alterations in original) (quoting U.S. Dept. of Interior, "Compilation of Administrative Policies for National Parks and National Monuments of Scientific Significance" at 65)); *see also Kennewick Irr. Dist.*, 880 F.2d at 1024 (explaining that decisions grounded in economic *considerations* are distinguishable from decisions grounded in economic *policy*).

As the Court explained above, "the Government has the burden of proving the discretionary function exception applies . . . and this is not done by mere subjective statements." *Bear Med.,* 241 F.3d at 1216 (citing *Prescott*, 973 F.2d at 702). The Court may not impose its own conjecture as to how the decision to provide the support it did to Plaintiffs was policy-based or susceptible to policy analysis. *See id.* The support must be in the record. *Id*.

The Court does not find sufficient support in this record. The Court thus concludes that the Government fails to establish that its decision to provide Plaintiffs the type of support it did was susceptible to policy analysis.

## V.  CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs' allegations are sufficient as a legal matter to invoke this Court's jurisdiction.  Accordingly, the Court DENIES the Government's Motion to Dismiss Plaintiffs' Second Amended Complaint.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, December 22, 2023.

Kenneth J. Mansfield
United States Magistrate Judge

CV19-658 KJM_Garcia, et al. v. USA_ ORDER DENYING DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT [ECF NO. 247]